# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
January 27, 2010 Session

## CHRISTOPHER LOVIN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Claiborne County**
**No. 12,557    E. Shayne Sexton, Judge**

---

**No. E2009-00939-CCA-RM-PC - FILED NOVEMBER 10, 2010**

---

The Petitioner, Christopher Lovin, appeals the Claiborne County Criminal Court's denial of post-conviction relief from his conviction for felony murder in the perpetration of aggravated child abuse.  On appeal, he contends that trial counsel rendered ineffective assistance by (1) failing to object to the State's amendment of his indictment, (2) failing to examine and rebut the State's medical witnesses properly, (3) failing to object to the State's use of demonstrative evidence, and (4) failing to object to the State's presentation of two theories of causation.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Jason D. Demastus, Chattanooga, Tennessee, for the appellant, Christopher Lovin.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William Paul Phillips, District Attorney General; and Jared Ralph Effler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner was convicted of felony murder in the perpetration of aggravated child abuse and sentenced to life imprisonment.  This court affirmed the judgment of the trial court and recited the facts of this case in the Petitioner's direct appeal:

> At 1:12 A.M. on October 16, 2000, Cindy Gerralls and Rita Hurst, emergency medical technicians with the Claiborne County Ambulance Service, were dispatched to a Tazewell

residence occupied by the [Petitioner], Christopher Lovin, and his fiancé, Bonnie Raske. Ms. Raske, the mother of the victim, four-month-old Caylis Lovin, was outside directing the emergency unit to the proper location. Within four minutes of the dispatch, Ms. Gerralls and Ms. Hurst arrived, finding the [Petitioner], the father of the victim, inside the residence kneeling over his son. The [Petitioner] had his left arm under a pillow and his right hand on the victim's abdomen. As Ms. Gerralls entered the room, the [Petitioner] remarked, "I can't do anything more, I've been doing this for 30 or 45 minutes." Because the victim was born three months prematurely and had been cared for in the neonatal intensive care unit at the University of Tennessee Medical Center, he was connected to an apnea monitor at the time the emergency personnel arrived. Ms. Gerralls determined that the victim had no pulse, was "very, very cold and blue and was not breathing." There was no sound of alarm from the monitor during the period the emergency technicians were at the residence. Ms. Gerralls and Ms. Hurst transported the victim by ambulance to the Claiborne County Hospital emergency room, arriving precisely 15 minutes after the original dispatch. The medical staff was able to generate a heart rate but was unable to establish spontaneous respiration. After approximately one hour at the emergency room, the victim was transported to East Tennessee Children's Hospital in Knoxville.

Dr. Joseph Child, a pediatric intensivist, and one of his associates, Dr. Jeff Queen, treated the victim upon his arrival at Children's Hospital. Dr. Child determined that the victim had an extreme buildup of acid in the bloodstream which was the result of either a prolonged period of oxygen deprivation or very low blood pressure. With the assistance of other specialists, Dr. Child was able to determine that there was blood around the surface of the brain and between the hemispheres. The brain was swollen and a CAT Scan indicated that there was no blood flow. Dr. Child described the victim as "cold" and "gray." The victim's kidneys were failing and the retinas of each eye were covered with blood. Treatment was unsuccessful and death resulted from oxygen deprivation.

Bobby Morelock, a detective with the Claiborne County Sheriff's Department, questioned the [Petitioner] while the victim was still alive. The [Petitioner] made the following statement:

He was pale all day and coughing and turning colors. Mom got him out of his swing once to check on him. Everything was pretty normal seemed like. He was still pale, gurgling a little but he was breathing. I told Bonnie he was sick, he was just kind of lifeless throughout yesterday and last night. Caylis was asleep when Bonnie went to bed around 12:00. Bonnie fed Caylis before she went to bed. Caylis was crying around 12:30 A.M. and Bonnie asked what he was crying for. I was trying to hook up the heart monitor on him. I fed him before I tried to hook up the heart monitor but I never got the monitor hooked up. I got his breathing treatments ready but Bonnie already had everything ready in the treatment. Caylis was on the couch and asleep so I got the breathing tube and put it close to Caylis's nose so I wouldn't wake him back up. When I got the treatment started and put the hose up to his nose, I held it there until it was done, about five minutes. I then put up ... the breathing treatment. I then went to get his stuff to change his diaper and wipe him off. When I got his clothes off, I noticed he wasn't breathing. One of the reasons I took his clothes off was to hook his monitor back up. I didn't see any response to him. I picked him [up] and didn't feel nothing. I had my left hand on the back of his head, holding it up and just kind of shook it, saying, Caylis, Caylis, hoping he would shake out of it. I leaned down and gave him a puff of air and looked over at the monitor and it was showing nothing. I laid him back down on the couch and began CPR. I was trying for around five minutes. I was just trying to get him back. I kept screaming for Bonnie for a while. [I] never

-3-

moved him from the couch. I kept giving him puffs and pushing on his chest sometimes. I had to push a little harder because he never would do nothing. Bonnie got up and panicked and I was cussing at Bonnie because she just kept running through the house there and I said go-go call an ambulance, he's not breathing. She left to call and I just kept trying to get him breathing. Every time I quit, the monitor would quit. The ambulance people got there and didn't bring nothing inside with them. They just picked him up and carried him to the ambulance when they came in. I just unhooked the plugs from the monitor.

On the day following his initial statement, the [Petitioner] was questioned by TBI Agent Steve Vinsant and Detective Morelock. By the time of this interview, the victim had died. Each of the officers recalled that the [Petitioner] had acknowledged that he was alone with the victim at the time the victim stopped breathing. They also remembered that the [Petitioner] never made mention of either shaking, striking, or dropping the victim. The [Petitioner] was arrested for murder on October 19, three days after the initial hospitalization.

Agent Vinsant recalled that during questioning, the [Petitioner] suggested that the emergency personnel may have injured the victim by jumping off the porch without properly supporting the head. Agent Vinsant recalled that the [Petitioner] had speculated that the rib fractures may have been due to his efforts at CPR. According to the officer, the [Petitioner] had stated that Ms. Raske had been in bed for over an hour before he called for medical assistance.

Dr. Child described infants generally as having large, heavy heads as compared to the rest of the body and having weak neck muscles, thereby making them particularly susceptible to a brain injury due to shaking. It was his opinion that the death of the victim, which occurred within hours after he was transported to Children's Hospital, was due to Shaken Infant Syndrome, which involves a tearing of the blood vessels

-4-

that support the brain. Dr. Child described the force required to cause the injuries to the victim as "severe" and "violent" in which "the head is just cracking like a whip at the neck." He also found internal bleeding into the abdomen as a contributing cause of death. The spleen was fractured, the liver was torn in three places, and the left kidney and adrenal gland were bruised and damaged, injuries which, in Dr. Child's opinion, "would have eventually led to this baby's death...." It was his assessment that the injuries to the internal organs were the result of "blunt force," which had been "directly applied," a force different from that causing the damage to the head.

Dr. Sandra Elkins, the Director of Autopsy Services and Forensic Pathology at the University of Tennessee Medical Center, and who also serves as Medical Examiner for Knox County, performed the autopsy. She also identified two separate areas of critical injury, either of which would cause death: head trauma qualifying as Shaken Infant Syndrome and blunt force injuries to the chest and abdomen. Dr. Elkins' findings included subdural hematoma or blood clotting on the surface of the brain, retinal hemorrhaging, rib fractures due to a compressing force, pulmonary contusions to the lungs, and severe internal bleeding due to lacerations of the liver and the spleen.

Dr. Elkins described these injuries as very uncommon in infants and, in her opinion, far too severe to result from a fall to the floor or any attempt at cardiopulmonary resuscitation. Dr. Murray Kevin Marks, a forensic anthropologist, assisted in the autopsy. He described a variety of rib fractures ranging from "creases" to "complete breaks." It was his opinion that the fractures were due to significant external pressure on the right front of the chest.

Ronald Ford, a pediatrician at Children's Hospital, described the victim as comatose but still alive upon his admission to the intensive care unit. Due to the signs of brain trauma and the resulting brain swelling, it was Dr. Ford's opinion that the victim had died of "very violent shaking." It was Dr. Ford's further assessment that because of the extensive

nature of the injury, the victim's brain was no longer able to send signals to the other organs to maintain their function.

Bonnie Raske, the 18-year-old mother of the victim, testified as a defense witness. She stated that the premature birth of the victim had caused breathing difficulties to such an extent that he required an apnea monitor. Ms. Raske confirmed that while the victim was born on June 11, he was not released from the hospital until September 2 and had been in her home for less than a month and a half at the time of his death. She described the victim as "always coughing, throwing up, he wouldn't hold his formula down." According to Ms. Raske, the victim was re-hospitalized, treated for pneumonia, and released about one week prior to his death. Seven months pregnant with a second child by the time of trial, Ms. Raske described the [Petitioner] as a loving father. She claimed that only hours prior to the episode that led to his death, the victim had stopped breathing and that she had revived him by shaking him and breathing into his mouth. Ms. Raske stated that the victim "constantly quit breathing" as indicated by his apnea monitor alarm. On the evening of the victim's last hospitalization, Ms. Raske and the [Petitioner] had bought wine and had drinks. According to Ms. Raske, she became intoxicated, went to bed, and asked the [Petitioner] to take care of the victim. She recalled being awakened when the [Petitioner] began to scream that the victim was not breathing. At the [Petitioner]'s direction, Ms. Raske called 911 while the [Petitioner] administered CPR, using "both hands."

The [Petitioner], testifying at trial in his own behalf, contended that he had planned a romantic evening with his fiancé and that after dinner, their lovemaking was interrupted when Ms. Raske became ill from too much wine. The [Petitioner] claimed that he later gave the victim his medication and prepared him for bed. The [Petitioner] stated that the apnea monitor alarm sounded as the victim stopped breathing. While acknowledging that he had shaken the victim's leg, the [Petitioner] claimed that he had done so gently in an effort to revive the victim and then breathed air into his mouth. The [Petitioner] testified that he began CPR by using an index finger

-6-

on the chest and that when there was no response, he screamed for help from Ms. Raske, who was too dazed to assist. The [Petitioner] stated that he then made contact with the victim's upper stomach in an effort to perform CPR and increased pressure to the area just above the navel. He described the pressure he applied with his hands as "more than I was realizing at the time." The [Petitioner] stated that he believed the victim was either dying or dead by the time the ambulance arrived. He described himself as in shock and acknowledged that he had squeezed the victim "so hard ... my arms were shaking" as he attempted resuscitation. The [Petitioner] also admitted shaking the victim but was unable to say how hard. It was his contention that the medication had caused the victim to stop breathing.

State of Tennessee v. Christopher Lovin, No. E-2002-01231-CCA-R3-CD, Claiborne County, slip op. at 1-5 (Tenn. Crim. App. Oct. 31, 2003).

The Petitioner filed a post-conviction petition that the trial court denied after a hearing. This court affirmed the trial court's judgment. Christopher Lovin v. State, No. E2006-01883-CCA-R3-PC, Claiborne County, slip op. (Tenn. Crim. App. July 5, 2007). The supreme court granted the Petitioner's application for appeal and held that this court erred in denying the Petitioner's motion to dismiss his retained appellate counsel and to represent himself on appeal. The court vacated this court's judgment and remanded the case to this court with instructions that we remand the case to the trial court for a hearing to determine whether the Petitioner knowingly and voluntarily waived his right to post-conviction counsel. Lovin v. State, 286 S.W.3d 275 (Tenn. 2009). The record reflects that the trial court determined that the Petitioner did not knowingly and voluntarily waive his right to counsel and appointed counsel. The Petitioner then, through counsel, filed his post-conviction appellate brief with this court.

At the post-conviction hearing, the Petitioner testified that trial counsel was deficient for allowing the State to present two theories of death, one involving Shaken Infant Syndrome and the other involving internal organ injuries. The Petitioner said that trial counsel should have requested that the State elect which injury was the cause of death. He said that forcing the State to elect a single theory of the cause of death would ensure an unanimous jury verdict based on a single theory.

The Petitioner testified that although trial counsel argued that the Petitioner injured the victim during CPR, trial counsel should have also argued that the injuries were caused by the Petitioner's attempts to remove improperly administered medication. The Petitioner

-7-

said he turned the victim upside down, squeezed his stomach, and shook the victim in an effort to dislodge the medication. He agreed that he explained these resuscitation efforts during the trial, but he said trial counsel failed to ask the State's medical experts if the Petitioner's attempts to remove the medication could have caused the victim's injuries.

The Petitioner testified that trial counsel failed to hire medical experts to rebut the testimony of the State's experts. He was unaware that trial counsel sent the victim's autopsy report and other medical records to Dr. Randall Pedigo for review. He was also unaware that Dr. Pedigo concluded that no reasonable medical expert would refute the conclusions of the State's experts. The Petitioner said that he did not have medical experts at the post-conviction hearing who would refute the medical testimony from the trial but that he asked his post-conviction counsel several times to learn the cost of hiring a medical expert and that counsel failed to do so. He also said his post-conviction attorney failed to comply with his request to subpoena the doctors who testified at the trial.

The Petitioner testified that he spoke with Emergency Medical Technicians (EMT) Rita Hurst and Cindy Gerralls on the night the victim was injured. Ms. Gerralls testified at trial, while Ms. Hurst did not. The Petitioner said that trial counsel should have called Ms. Hurst to testify at trial because her testimony would have supported his statement that he improperly administered the victim's medication. He said that Ms. Hurst's report stated she was unable to insert a breathing tube into the victim because of excess secretions in his airway. He said he told Ms. Gerralls that he gave the victim's medication improperly. He noted that his statement to Ms. Gerralls was contained in her written report. He agreed that the medical experts at trial did not state that medicine or congestion killed the victim.

Trial counsel testified that he began working as a public defender in 1990 and that he dealt exclusively with criminal defense law. He said he had represented many defendants charged with murder. He said he discussed trial strategy with the Petitioner and that they agreed that it was best to go with a single theory of defense based on the Petitioner's claim that the victim's injuries were accidental.

Trial counsel testified that the Petitioner told him of his attempts to perform CPR and his attempts to remove medication that he improperly administered. He said he asked the State's medical experts if the victim's injuries could have occurred accidentally or through the improper use of CPR. He could not recall if he asked them if the injuries could have occurred during the Petitioner's attempts to remove medication.

Trial counsel testified that he consulted Dr. Pedigo to determine if he could present a defense based on medical testimony. He said that Dr. Pedigo concluded that the injuries were most consistent with a violent assault and did not appear to be consistent with

accidental injuries caused during CPR. He said Dr. Pedigo's findings were consistent with the findings of the State's medical experts, including those of Dr. Sandra Elkins. Trial counsel said he met with Dr. Elkins to discuss the medical evidence. During that discussion, he asked Dr. Elkins many questions, some of which were prepared by Dr. Pedigo.

Trial counsel testified that he had access to the EMT reports made by Ms. Gerralls and Ms. Hurst. He said Ms. Hurst's report stated that the victim's airway was congested with secretions. While he admitted that Ms. Hurst's statement was consistent with the Petitioner's testimony that the victim was congested, he did not think that her statement would be helpful to the Petitioner's case. He said he was unaware of any beneficial information that Ms. Hurst could have added to the testimony given by Ms. Gerralls at trial.

At the conclusion of the hearing, the trial court stated:

> I have listened to the testimony of . . . the petitioner, and also . . . trial counsel, and the Court is of the opinion that in applying the Strickland standard that I am required to apply, that any . . . harm or prejudice that might have occurred through [trial counsel's] ineffectiveness did not . . . sufficiently prejudice the [Petitioner] or the verdict in this case to the extent that relief should be granted. I'm not saying by inference that [trial counsel] was ineffective. I recall this case specifically. This was a very difficult case . . . . [The petitioner] was afforded a very admirable defense. [Trial counsel] and his staff, along with all the other public defender attorneys and investigators, investigated and fleshed this case out as best as it could be fleshed.
>
> [With regard to the tissue box demonstration] [trial counsel] might have objected to that, and the way I'm recalling that, it just happened . . . whether or not an objection would have cured a problem, I don't know. It was a dramatic setting and it certainly had an impact on this jury.
>
> [With regard to amending the indictment] . . . this Court would have granted the request to amend the indictment over the objection of the [Petitioner], so I don't think that there is . . . any claim or there's any legitimate proof that . . . [an objection] would have changed the outcome of this trial or that would have changed whether or not [trial counsel] was effective.

-9-

. . .

[With regard to the medical testimony,] [i]t's clear that the defense did an adequate job in seeking expert assistance to protect [the petitioner's] claim concerning the . . . nature of the injuries. The engagement of Dr. Pedigo was an important factor in that regard . . . I think that the defense counsel . . . addressed that issue as best as they could . . . .

. . .

[With regard to] the question whether or not the State should have been required to elect a theory . . . this court routinely gives jury unanimity charges when there is a situation that a jury might return a verdict [based only on] . . . one separate offense . . . where the allegations of proof [show] . . . multiple offenses. In this particular case, the State has relied on multiple theories . . . but the act by the [Petitioner] in this case . . . the single act could have brought about death in either fashion, so I don't think there is any merit to that.

The burden in a post-conviction proceeding is on the Petitioner to prove his allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). Once a petitioner establishes the fact of counsel's errors, the trial court must determine whether those errors resulted in the ineffective assistance of counsel. Dellinger, 279 S.W.3d at 293; see Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006).

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will

-10-

only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Our supreme court has held that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

## I

The Petitioner contends that trial counsel rendered ineffective assistance by failing to object to the State's amendment of the Petitioner's indictment. The State contends that trial counsel's performance was not deficient because the amendment removed surplus language but did not change the offense charged or the underlying facts. We hold that the trial court properly found that trial counsel was not ineffective by not objecting to the amendment.

The indictment charged that the Petitioner "on or about October 15-16, 2000, . . . did unlawfully, feloniously, and recklessly kill CAYLIS LOVIN during the perpetration of aggravated child abuse, in violation of T.C.A. 39-13-202." Before trial, the State filed a motion to amend the indictment by deleting the word "recklessly." Trial counsel did not object to the amendment.

At the time of the offense, the first degree murder statute provided:

**39-13-202 First degree murder.**

(a) First degree murder is:

. . .

(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy; . . .

(b) No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in such [subdivision].

T.C.A. § 39-13-202(a)(2), (b) (Supp. 2000) (amended 2002, 2007). The aggravated child abuse statute provided:

**39-15-402 Aggravated child abuse and neglect.**

(a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:
(1) The act of abuse or neglect results in serious bodily injury to the child; . . .

Id., § 39-15-402(a)(1) (Supp. 2000) (amended 2005, 2009). The offense of child abuse was defined as:

**39-15-401 Child abuse and neglect.**

(a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits [child abuse or neglect].

Id., § 39-15-401(a) (Supp. 2000) (amended 2005, 2006, 2008, 2009).

-12-

Both the United States and Tennessee constitutions guarantee an accused "the right to be informed of the nature and cause of the accusation." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citing U.S. Const. amend. VI, XIV; Tenn. Const. art. I, § 9). An indictment will be deemed valid so long as it provides sufficient information to enable the defendant to know the accusation to defend, to furnish the trial court an adequate basis for entry of a proper judgment, and to protect the defendant from double jeopardy. See id. at 727. The court has likewise stated that "indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). To this end, "specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000). At the time of the Petitioner's trial, Rule 7(b) of the Tennessee Rules of Criminal Procedure allowed an indictment to be amended at any time with the defendant's consent or, if without the defendant's consent, before jeopardy attached and only if "no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced." See Tenn. R. Crim. P. 7(b) (2000) (amended 2006).

The indictment, as originally drafted, met the notice requirements. It charged that the Petitioner committed first degree felony murder in the perpetration of aggravated child abuse of a named victim on a stated date. The indictment cited the pertinent penal statute. From this, the Petitioner knew the charge against which he must defend, the court had a basis for entry of judgment, and the Petitioner was protected from double jeopardy. See State v. Hill, 954 S.W.2d at 727.

Following its 1995 amendment, the felony murder statute that was in effect at the time of the crime stated that no culpable mental state, other than that required by the underlying felony statute, was required. T.C.A. § 39-13-202(b); see 1995 Tenn. Pub. Acts ch. 460, § 1 (amending felony murder statute to delete element of reckless mental state). The word "recklessly" in the indictment was surplusage. See State v. Hopper, 695 S.W.2d 530, 535 (Tenn. Crim. App. 1985) (inclusion of element of deliberation in felony murder in indictment was surplusage and could not have misled the defendant). The statute for the offense of aggravated child abuse required that the perpetrator act "knowingly." The amendment of the indictment to remove the word "reckless" did not change the offense. The Petitioner was on notice of the required mental state because the indictment named the underlying felony. Because the amendment was proper under Rule 7(b), there was no basis for trial counsel to object to the amendment. Further, the Petitioner was not prejudiced by the amendment because the same offense was charged.

We have not overlooked the Petitioner's claim in his brief that his due process rights were violated by the State's "surreptitiously sidestepping the indictment procedure and

-13-

allowing the grand jury to indict the Petitioner for felony-murder based on lesser 'reckless' conduct when the crime for which he was tried and convicted required the more culpable standard of 'knowing' conduct to be considered." The original indictment reflects that the grand jury indicted the Petitioner for recklessly killing the victim while knowingly committing aggravated child abuse. To the extent that the grand jury found evidence of a reckless killing, the indictment reflected a more culpable killing than that which would be legally sufficient to sustain a conviction of felony murder. This theory provided no basis for trial counsel to have lodged a meritorious objection.

The trial court did not err in finding that the Petitioner failed to prove that counsel was ineffective for failing to object to the indictment amendment. The Petitioner is not entitled to relief.

## II

The Petitioner also alleges that trial counsel was ineffective by failing to examine the State's medical witnesses properly and by failing to rebut the State's expert proof. The State contends that the trial court properly denied relief on this basis. We agree with the State.

The Petitioner's complaints are that trial counsel did not cross-examine the State's medical experts about whether the victim's injuries could be explained by the Petitioner's having improperly administered the victim's medication, that counsel did not present proof that EMT Rita Hurst noted upon her arrival at the scene that the victim had "so much secretions" that he could not be intubated, and that counsel did not present defense expert proof to contradict the State's expert proof. The record reflects that counsel consulted Dr. Pedigo, who, after reviewing the autopsy report and speaking with the forensic pathologist who performed the autopsy, offered his opinion that no reasonable medical expert would disagree with the conclusions of the State's experts. Trial counsel had Dr. Pedigo assist him by providing questions for counsel to ask Dr. Elkins.

Counsel testified that he met with Dr. Elkins and consulted with the Petitioner about her statements. He said that Dr. Elkins believed the victim suffered the worst case of child abuse that she had ever seen and that counsel concluded that he would be unable to find a reasonable forensic expert who disagreed with her.

Although the Petitioner complains that counsel should have consulted more than one medical expert, he failed to present the testimony of another medical expert at the post-conviction hearing. He failed to establish that there was a qualified expert who counsel exercising reasonable diligence could have called to rebut the State's experts.

-14-

Given this information, counsel had no basis for cross-examining the experts about improper medication administration. There was also no relevant basis upon which to offer Ms. Hurst's testimony or her report of the excess secretions. Likewise, counsel had been advised that no credible expert would testify that the victim's death was caused by improper medication procedure. The Petitioner did not present any expert proof at the hearing to establish that his theory of improper medication was possible and therefore should have been pursued by counsel.

## III

The Petitioner contends that counsel was ineffective by failing to object properly to a demonstration the State had the Petitioner do during cross-examination and that counsel failed to preserve the issue for the motion for new trial and the direct appeal. The demonstration consisted of the Petitioner's actions toward the victim and was performed with a tissue box representing the victim. The State responds that trial counsel's objection was overruled and that the Petitioner has not shown prejudice. We agree with the State.

Whether to allow a demonstration is a matter for the discretion of the trial court. State v. Underwood, 669 S.W.2d 700, 704 (Tenn. Crim App. 1994). Like all evidence, the demonstration must be relevant evidence, and its probative valued must not be substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 401, 403.

> A defendant's right to a fair trial may be infringed if he is forced to perform acts which would unjustly prejudice him. See United States v. Doremus, 414 F.2d 252, 253-54 (6th Cir.1969); State v. Ronald Bradford Waller, No. E1999-02034-CCA-R3-PC, 2000 Tenn. Crim. App. LEXIS 558, at * *38-39 (Tenn. Crim. App. July 18, 2000, at Knoxville), perm. to app. denied (Tenn.2001). Prejudice may arise in cases where the requested performance or demonstration would unjustly humiliate or degrade the defendant, or where such performance would be damaging to the defendant's image and is irrelevant to an issue at trial. Doremus, 414 F.2d at 254.

State v. Detrick Cole, No. W2002–1254-CCA-R3-CD, Shelby County, slip op. at 10 (Tenn. Crim. App. Nov. 24, 2003) (holding that fingerprinting a capital defendant in front of the jury during penalty phase of the trial did not violate the defendant's constitutional rights and was proper as part of the State's proof of the defendant's identity as a person convicted of prior violent felonies), aff'd, 155 S.W.3d 885 (Tenn. 2005).

The record reflects that during the demonstration, trial counsel said, "Your Honor, I don't know if he can do that on a box of Kleenex or not, accurately demonstrate . . ." The trial court ruled that the demonstration would be allowed, subject to it appearing to be adequately demonstrated. With respect to the demonstration itself, the record before us does not provide an extensive description of the Petitioner's actions. The trial record reflects that the demonstration took place during portions of cross-examination of the Petitioner covering seven pages of the transcript and that the questions dealt generally with the amount of force the Petitioner used when he attempted to revive the victim by using CPR and by squeezing and shaking him. We note that the Petitioner's theory of defense was that he improperly medicated and then injured the victim when he attempted to revive him. The Petitioner admitted shaking the victim and attempting CPR. The manner in which he physically handled the victim was highly relevant to the central issues in the case. Although the Petitioner argues that the demonstration was unjustly prejudicial, the record does not provide clear and convincing proof that the demonstration was inadmissible proof for which counsel was ineffective for failing to have excluded or for not obtaining appellate relief. The trial court did not err in denying post-conviction relief.

**IV**

In his last issue, the Petitioner contends that trial counsel was ineffective because he failed to object to the State's use of two theories of causation for the victim's death and failed to require that the State elect a single theory of death. He contends that the jury verdict against him was improper because it was not unanimous. The State responds that the prosecution was entitled to rely on evidence that the victim suffered multiple injuries, at least two of which were severe enough to be fatal, during the perpetration of aggravated child abuse on the date named in the indictment. We agree with the State that the Petitioner is not entitled to relief because there was no election or juror unanimity problem.

The courts of this state have repeatedly held that when evidence is presented of multiple offenses that would fit the allegations of the charge, the trial court must require the State to elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. See, e.g., State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1998); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134, 136 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).

> This election requirement serves several purposes. First, it
> ensures that a defendant is able to prepare for and make a
> defense for a specific charge. Second, election protects a
> defendant against double jeopardy by prohibiting retrial on the

> same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000). The requirements of election and a jury unanimity instruction exist even though the defendant has not requested them. See Burlison, 501 S.W.2d at 804.

"When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises." Adams, 24 S.W.3d at 294 (discussing that no election is required for continuing offenses). Consequently, the trial court may properly submit to the jury multiple counts embodying different theories for committing a single offense. See State v. Lemacks, 996 S.W.2d 166, 171-72 (Tenn. 1999) (holding that no election was required by proving alternative theories of guilt for one offense of driving under the influence of an intoxicant); State v. Cribbs, 967 S.W.2d 773, 778 (Tenn. 1998) (holding that counts alleging premeditated and felony murder may be submitted to the jury for a single murder).

In the present case, the indictment charged that the Petitioner committed the offense of felony murder in the perpetration of aggravated child abuse "on or about October 15-16, 2000." The State presented evidence that the victim had multiple injuries caused by the Petitioner during one criminal event and that two of the injuries could have been fatal. See State v. Hodges, 7 S.W.3d 609, 624-25 (Tenn. Crim. App. 1998) (no election required for conviction of felony murder in the perpetration of or attempt to perpetrate aggravated child abuse where State presented two alternative means of culpability for a single offense, not two alternative offenses). The Petitioner was charged with only one offense, and the proof showed alternative means of committing the offense, not alternative offenses. No election was required. Trial counsel was not deficient because he did not object to the State's alternative theories and did not request a unanimity instruction. The trial court did not err in denying post-conviction relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE